Your Honor, on behalf of appellants, I am Don Ramsey. I think we have agreed among ourselves You need to speak into the microphone so I can hear you. We have agreed among ourselves that we would allocate the 20 minutes with me, on behalf of Officer Appellant Peroni, using 10 minutes, and my colleagues using 5 minutes each on behalf of their respective clients. Okay. Well, just watch your time. You may run into other people's time. I will indeed. And if you could allow counsel to come forward, tell me how. Yes, Your Honor. John Burris, on behalf of the appellee, Mr. Siegel and I would divide the time equally, 10 minutes apiece. All right. Thank you. If we need to, of course. Thank you. And so on rebuttal, how are you going to do rebuttal? I would, depending on what opposing counsel thinks, I think it would be useful. Could you speak into the microphone, please? All right. I think it would be better to do rebuttal after each phase of the argument. So I would argue for 9 minutes. I would save a minute for rebuttal in between. There's no cross-appeal here, is there? No, there is not a cross-appeal. Just an appellee. Yeah. If that is okay with the Court, that's, I think, what we would prefer. But if the Court wants something different. Okay. So separate each individual. Yes. Okay. All right. That's fine. Let's proceed. Okay. Well, good morning, Your Honors. My name is Don Ramsey, and I am representing Appellant Anthony Peroni in this appeal. I'd like to reserve 1 minute for rebuttal. And there are two issues I would like to address. The first We're only here on qualified immunity, right? Yes. I would like to address the qualified immunity question with respect to the Terry stop or the initial investigatory detention. And I would like to deal with the question of qualified immunity regarding the trial court's determination that there was a de facto arrest. Proceeding to the first point. The question of whether or not there was a valid Terry stop is determined by whether Officer Peroni had a reasonable suspicion based on articulable facts that there was criminal activity afoot at the Fruitvale station, the BART system, at 2 o'clock in the morning following New Year's Eve. I would submit there are four factors that demonstrate the basis for reasonable suspicion. The first is that it's inarguable, everyone concedes, that at 2 o'clock in the morning there was a report of a fight on the lead car of the BART train approaching the Fruitvale station involving a large group of black men. Second, no one contests that within seconds after the arrival of that train at the Fruitvale station, Officer Peroni was there. When he was there, thirdly, he sees the plaintiffs who are outside the lead car. No one contests this. Fourth, even the plaintiffs concede that there was a partial match or a good match between the description of a large group of black males in black clothing who were involved in the fight. On that basis, Officer Peroni determines that there is a reason to stop these individuals and proceeds to do so. The operator of the train was a woman? Yes, it was, Your Honor. Did she observe the altercation? She had a report from someone. There's no, isn't it? I think that's correct. It was reported to her by another passenger. That's correct. And specifically, what information did the train operator pass on to the radio system? That there had been a fight? It's a 242, which is a misdemeanor battery under California law. I'm looking for the words that the train operator used to convey what had been conveyed to her. Those were the words, in fact, Your Honor. 242. 242, which is a misdemeanor battery involving a large group of black males, no weapons seen in the lead car of the train approaching the Fruitvale Station. When Peroni arrived, whatever had occurred on the train was complete, correct? He didn't know that, but, yes, it would have been complete. Were people fighting on the platform? No, they were not. No, they were not. But he observed the plaintiffs outside the lead car seconds after the train arrived. Do I understand correctly that there was another group of African American men that he passed by and determined had not been involved in the altercation? That is one of the facts that was assumed by the trial court in making its determination. You're correct, Your Honor. That's true. And what caused, what's in the record that caused Peroni to focus on the group that's the plaintiffs? They are outside the lead car where the fight was reported. And they are a group of black men wearing, well, dark-skinned citizens wearing predominantly dark clothing. And that is consistent with the report that the officer received over the radio. That's it. Okay. What are the factors that give rise to the, you know, legitimacy of the Terry stop? The factors are very simple. Proximity of time. He arrives within seconds after the train arrives. Proximity of time to what? To the report. This is not a report. Well, the report doesn't give rise, like, for any right for him to arrest anybody, right? Excuse me, Your Honor. I didn't hear correctly. I say the report doesn't give rise to any right for Peroni to arrest anybody. No. The report itself doesn't. But it's a contemporaneous report. This is not a report from yesterday or an hour ago or 15 minutes ago. This is a report. So that's a report of a completed misdemeanor. So what right, so what authority does Peroni have? The report is of an ongoing fight on the lead part of the train. No, you're just talking to Judge Hawkins. You just said nothing was going on. Everything was done. But it's a report of a crime that he is required. That has been completed. He is still required to investigate it, is he not? No. He can investigate, but isn't it true in California, he doesn't have, your client wouldn't have had authority to arrest anybody based on a completed misdemeanor? This was really a 242, and it looks like the district court assumed that it was based on everything that was presented in the district court order. So trying to find out if it's a completed misdemeanor, which I think you've all but admitted to, certainly in your papers and somewhat here today, what authority your client would have had to proceed as he did. He arrives within seconds after the arrival of the train. He has a report of a recently committed violent crime. Could he have ordered every occupant of the car? Was there more than one car? Well, yes, yes. I don't know how many cars, but there were probably 10 or 15 cars. A normal BART train. Yes. Could he have ordered every single individual on the train to remain there while he sorted out this completed misdemeanor? No. I don't think that would have been reasonable, and that's not what he did. He went to the lead car where these individuals were standing, Your Honor. You've told us that now three times. Okay. Could he have ordered all African males on the train to remain on the train while he sorted out this completed misdemeanor? No. I think that would have been unreasonable under the Graham v. O'Connor standard and unreasonable under the Fourth Amendment, and that's not what he did. In any event, when he arrived there, the individuals that became the plaintiffs were not on the train, right? No, they were not.   He didn't go to the lead car where the criminal activity had been reported. Did Peroni ask these individuals about what had gone on? He tried to, but they didn't respond. Two of them reboarded the train, and three continued to walk away. Yes, he did ask them. I wanted to ask you some questions about this fight. His total and complete investigation of the fight, in terms of looking for a victim, was going to the driver and saying what happened. The driver said something, and he didn't pursue anything else in terms of a victim being harmed or anything like that. Your Honor, it's 2 o'clock in the morning, following a New Year's Eve night, where even the plaintiffs admit that the cars are filled with revelers, i.e. people who are intoxicated, because we all encourage people to take public transportation on nights like New Year's Eve, where the plaintiffs admit that there are a lot of fights and a lot of misunderstandings. He is racing up to the platform. He is, by himself, he is outnumbered. He has a report of a large group of men involved in a fight. He does not have the opportunity. He does not have the chance that we all do here as lawyers and officers of the court and justices to weigh the circumstances in hours and days. He is forced to make a split-second decision, and his decision is, I think these are the guys, and I need to detain them, because they are heading toward exits and getting back on the train. But I need to detain them based on a 242, which is a misdemeanor battery, of which, by all accounts, is over by the time he gets there. He doesn't know that, Your Honor. The question of qualified immunity is supposed to be determined by a series of maxims and principles that involve not second-guessing. What evidence is there, though, that the misdemeanor battery was still ongoing? I mean, you yourself said he identified the people as he was approaching. He identified those people because they were outside the lead car, and they were standing there. Yes, they were outside the lead car at the right time, the right place, and they partially matched, and he doesn't know at that point. Well, they weren't fighting. They weren't fighting. They were off the train. But the question is not whether he has probable cause to arrest. The question is whether he has reasonable suspicion to ask a question. That's all he was trying to do, and that he emphatically had. Otherwise, he abandons the entire investigation and wanders back downstairs and gives it up. You cannot ask the officer. Excuse me. I'm sorry. You are not in front of a jury, and you are not making any progress in your argument by yelling at us. I'm sorry. I'm sorry. Moderate your tone and your point. I'm sorry, Your Honor. I'm sorry, Your Honor. The defense has to go on.  Your Honor, I'm simply trying to emphasize that Officer Peroni at that time had to make a split-second judgment. That is one of the reasons for qualified immunity. You've now used 12 minutes of allocated time. Okay. Then I will. Is there anything else, any fact that you haven't already told us that is in the basket, if you will, of probable cause? Or have you identified all of the things? I think I've tried to do so, Your Honor, and then thank you. Do you want to have them respond to them? Yes. Go ahead and respond. Thank you, and may it please the Court. My name is Dan Siegel. I'm appearing for the appellees Jack Bryson, Nigel Bryson, Michael Greer, and Carlos Reyes in the Peroni matter. Is his name on the? Yes. He's number 2, Siegel. Okay. All right. I wanted to make sure you get credit for making the argument. Thank you, Your Honor. The information that Officer Peroni had as he bounded up the escalator was what dispatch told him. Quote, it's the lead car, no weapons, all black clothing, large group of BMs is all we have. That was precisely what was said to him. And as he came up onto the platform, he noticed five people, our clients, my clients and Oscar Grant, standing nonchalantly, which was the word that was used, near the entrance to the first car. Now, clearly, if they were involved in the fight, the fight was obviously over. If the fight was ongoing, then they were not involved in it. So I think that counts as one. If the fight was over, we do have some authority that an officer in a terry situation can conduct and further investigation of a completed misdemeanor if the surrounding circumstances reasonably informs him that he should. And for this fellow, it was New Year's Eve. There were lots of revelers. I mean, isn't there a sufficient cause just to conduct a further investigation under Terry? You know, who knows whether these people would get back on the train and start up the ruckus again? I mean, isn't there a sufficient cause just to conduct a further investigation under Terry? It depends. It does depend. So, you know, do you give the benefit of the doubt to the officer or not? It's true he is entitled to the benefit of the doubt. It's also true that my clients are entitled to have the evidence viewed in the light most favorable to them. They didn't meet the description. They were not a large group of black males. They were a large group of people of various races. There was a woman with them. They were not wearing all black clothing. In fact, the evidence is, is that all of the men were wearing blue jeans, which is not all black clothing. In addition, Oscar Grant was wearing a red T-shirt. So even based on the little bit of information that Officer Peroni had, he was simply picking these people out of the crowd based upon his perception that they were dark skinned. The other points that counsel make, the surrounding circumstances, are kind of, in this situation, irrelevant. Well, of course, he was there because a crime had been committed. Of course, he was at the right train station. He wasn't at Coliseum or West Oakland. And of course, it was the time soon after. The only thing that called his attention to my clients was the color of their skin or the shade of their skin and where they were standing. Their conduct was not consistent with having been in a fight. It might have been, and that would, of course, be in a different case, if Officer Peroni had walked up to them and said, do you guys know anything about a fight? I heard there was a fight. He didn't do that. He drew his taser and became extremely aggressive with them. The best Wasn't the fact that they tried to walk away, couldn't that be considered evasive action, which goes into the factoring of whether or not this was reasonable? Well, this Court's decision in the Morgan case, upon which we rely, is that simply turning away from a police officer and being of the race of the suspect who has been These are not men who ran away. Three of my clients simply continued to walk in the direction of the exit, which seems natural. Getting off the train, you walk to the exit. They didn't engage in a headlong flight. Well, do you concede that the officer, Peroni, arrived within seconds? I believe that's how your opposing colleague described it of the report. I can't imagine it was seconds because the report came in, the train stopped, the passengers, including my clients, got off the train. Officer Peroni, who was somewhere in the neighborhood of the Fruitvale Station, pulled up, got out of his car, and went up to the platform. Now, no one has been able to quantify the precise number of seconds involved, but it doesn't sound to me to be a few seconds. Our point, though, is simply that based upon this Court's decisions in the Morgan case and in Liberal v. Estrada, which is a 2011 case, that he did not have sufficient basis for stopping my clients, and particularly I think the district court gave a lot of credence to the fact that he walked through another group, apparently of African-American men, and paid absolutely no attention to them. But they weren't at the lead car, and this fight was reportedly in the lead car. I mean, so it seems like they're, when you look at the totality, instead of individually of, yes, you can't stop anybody just because they're African-American or black, yes, you can't stop somebody solely because of their clothing, you know, you can't stop, et cetera. But when looking at the totality of what happened here, he gets a report there was a fight in the front lead car of, I think it was black males wearing dark or black clothing, and that's where he goes. I don't know that that's, I mean, unreasonable to say, okay, this other group was not near the front of the car. What the evidence reflects, Your Honor, is that Officer Peroni immediately drew his taser, pointed it at my clients, ordered them to go up against the wall, and went swearing in the direction of the other two individuals. One of the important points, which is absent completely from my opponent's argument, is that no one ever said whether the group of black males were the victims or the aggressors. And, again, I think that underlies the wisdom of the Court's decisions in Morgan and Liberal, because the point of those decisions is to avoid racial stereotyping. Clearly, Officer Peroni had no idea whether my clients were engaged in the fight and even if they were engaged in the fight, whether they were victims or aggressors. He assumed because they were black males or dark-skinned males that they were the aggressors and immediately took aggressive action. Thank you. Very brief rebuttal, Your Honor, several points. First, there is no question that Officer Peroni arrived on the platform within seconds of the arrival of that train. He was not in a car outside the Fruitvale Station. He was on the lower deck, so to speak, of the Fruitvale Station. He raced upstairs. He got the call, a second call, 18 seconds after the first one, indicating a more completely large group, black males, black clothing. He was there within seconds after the arrival of that train, and there is no dispute about that whatsoever. He was there 18 seconds after the first one. When was the first one? The first call was, well, 18 seconds earlier. It was when he was downstairs arresting someone for being intoxicated in public, but he was not in a car. He was not in the neighborhood. He was downstairs. He was racing upstairs, and he was there within seconds. Secondly, the lead case with respect to whether or not a Terry stop becomes a de facto arrest is Washington v. Lambert. Washington v. Lambert first outlines the fact that you use a totality of the four factors that courts had used to determine whether the degree of force and the degree of restraint of liberty was something that would keep it consistent with a Terry stop or make it a de facto arrest. Two of those factors, which are non-exclusive factors, are present here. One, the uncooperativeness of the suspects or the plaintiffs. Here, there's no question that they were uncooperative. They didn't comply with his request to stop. Two, re-boarded the train, and three, headed toward the exit. That is uncooperative. Second, under Washington v. Lambert, it is okay and proper to use more intrusive means of conducting a Terry stop if the stop closely follows the report of a violent crime. It's exactly what we have here. It's a report of a fight on the lead car. And so I would submit that both the Terry stop was valid under qualified immunity standards and that it did not, under qualified immunity standards, become a de facto arrest. All right. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is Allison Berry Wilkinson, and I represent Appellant Officer Marisol Domenici. I would like to reserve one minute for rebuttal, if I may. Officer Domenici was granted qualified immunity by the lower court for all of her actions up to the point in time that Officer Peroni made the arrest order for Mr. Grant and Mr. Greer. At issue here is the fact that she was denied qualified immunity for the continued detentions of Jack and Nigel Bryson, along with Carlos Reyes, after the arrest order was issued. As you are aware, qualified immunity is an entitlement not to stand trial. And what we have here is a ---- Continued detention, you mean in place at the platform? Yes, in place at the platform, and then after transfer to the police department. So the lower court cut off the time factor for the qualified immunity when the arrest order was issued. We then had continued detention on the platform because minutes later there was a shot that was fired by Officer Meserly, and then the plaintiffs were transported to the BART station and held there. There's no question in the record that the order to remove the plaintiffs from the station, or from the platform, and take them and detain them continued at the station, was issued by Commanders White and Gibson. And there's no evidence that Officer Domenici was involved in that particular detention. But the district court based her decision on the video that she identified Officer Domenici on the video, and therefore, it seems like it's a question of fact. And I think you're aware that our review is here limited to questions of law. How do ---- What can we do for you? And I thank you, Your Honor, because that is a key point here. The facts underlying the decision of the district court are subject to review to determine whether or not they are material and are, in fact, genuine. And an examination of that very video places this case in a similar situation as Scott v. Harris, where the video definitively establishes a fact. And the fact definitively established by the video is the fact that Officer Domenici was not nearby when Officer Peroni issued the arrest order. She was with her back on the video, as the evidence in the testimony showed. Her back was to the arrest order. She was yards away. And she was dealing with Mr. Anicetti and Mr. Caldwell, who were interjecting themselves into the scene. And so her responsibility at that point was for controlling the perimeter of the continued detention by Officer Peroni. So with that evidence, there's nothing to suggest that she even knew, let alone was aware, that the arrest order was issued. And if she was unaware that a distinction was made between Mr. Grant and Mr. Greer Didn't the district court interpret that same evidence as her giving assistance during the arrest? The appellees have argued that her assistance was as armed backup. Yet if you look to the evidence that they cite in the record, it is all to armed backup at the point of the initial detention, which is the conduct for which she received qualified immunity. Other than that, once the arrest order was issued through to the shot, through to their being transported to the station, her responsibilities were merely to ensure that the train, that the scene was contained and that the train departed. So from there, yes, was she armed. That's undisputed. Yes, was she on the platform? Certainly. But was she backing up the continued detention? No. Her duties were separate. Her responsibility was separate. And it's amounting to, in essence, a determination that her mere presence on the platform was what held her not to have qualified immunity, which is insufficient. Isn't that an argument for the jury now at this point? I don't know. Again, what's your authority? I mean, that these findings are reviewable in this procedural posture? Yes, Your Honor. There are three cases which, in essence, I believe, demonstrate that this Court has the authority to review the underlying facts of the case, whether or not there is a genuine or material set of facts, or whether, in fact, they were truly undisputed there. The first is Scott v. Harris, in which the United States Supreme Court determined that they could look at the video to evaluate whether what was identified below as a dispute of fact between the plaintiff's version and the defendant's version was actually a true dispute of fact, or whether or not the video definitively resolved that. The second is Wilkinson v. Torres, a case that was cited in our reply brief, in which the Court reviewed below the facts in the light most favorable to the plaintiff's and found that, in fact, there was an immediate threat to the safety of the individuals. Reviewing the facts for the purposes of determining, A, are they material, B, is it a genuine dispute, and C, what is the ultimate legal determination in there.  Thank you very much. You're welcome. Thank you. Thank you again, Dan Siegel, for the appellees in the case of Officer Domenici. And I guess I'd just have you respond directly to the cases cited. I mean, what's your response to that Scott v. Domenici to go back and re-review and decide differently? The Court may certainly determine whether there is or is not evidence when viewed most favorably to the appellees supports the decision not to grant qualified immunity. In this case, if the Court goes back and reviews the evidence, it will see the evidence, not only the videotape, but that Officer Peroni initially told Officer Domenici to watch the three initial detainees. He then goes to the train and brings back Mr. Grant and Mr. Greer. By the time he returns, three other officers have arrived. So there are now a total of five officers. According to his testimony, he tells those officers, not excluding Officer Domenici, to continue to watch the five people. He then goes and speaks to the train operator, who basically tells him, in fact, literally tells him this is a bunch of B.S. Peroni decides at that point that no one is going to be arrested for the 242, for the alleged fight. Only Oscar Grant and Michael Greer are going to be arrested for 148 for not cooperating with the investigation. He goes back to the group, the five detainees and the four officers, and announces that I'm going to arrest Grant and Greer for 148. At that point, there is no basis in law or fact for the continued detention of the other three plaintiffs in the case. Now, the question is, what is Officer Domenici doing at that point? As I said earlier, she has been instructed to watch the five. No doubt there are some other people come up, and she testifies that she's also interested in what they're doing. At the same time, and it's in the record, Nigel Bryson testifies that he is engaging with Officer Domenici as she waves her taser in his face, and they have a verbal interchange. Now, viewing the facts in light most favorable to the plaintiffs, it is certainly reasonable for a jury or other finder of fact to infer that Officer Domenici is continuing in the detention of Nigel, of Nigel, while Officer Peroni is engaged in the arrest of Grant and Greer. That is all in addition to the videotape. I think it gets back to our initial point that these are questions of facts. If at trial it turns out that Officer Domenici has somehow absented herself, or left the detention, then perhaps she will be entitled to the jury's verdict. But I think the overriding legal concern here is this Court's decision in Torres v. the City of Madera having to do with the continuing seizure doctrine. Certainly, my clients continued to be under detention by the group of BART police officers from the time that Officer Peroni first stopped them up until early the next morning when they were finally released from custody after spending the night in handcuffs at BART police headquarters. Officer Domenici, as being part of that detention process, is not entitled to qualified immunity in light of the evidence that we have presented indicating her engagement in the process of detaining these three men. All right. Thank you. Thank you, Your Honor. Very briefly in response, the instruction that counsel pointed to in his argument was given for that period of time in which Officer Domenici already received qualified immunity. There's no dispute that she was instructed upon her arrival to guard the individuals while Officer Peroni then went to talk to the train operator. She's already received qualified immunity for that. The question is, once he came back from the train operator, was it reasonable for her to continue to believe that that detention and then the removal from the platform was reasonable? And the plaintiffs never submitted down below any evidence to suggest that she knew of the arrest order. What was submitted down below was the evidence from the video that showed that at the time of the arrest order, she had already left the scene of the detention and proceeded on to additional duties. The key factor that the district court found that eliminated qualified immunity was knowledge of the arrest order, making it unreasonable for her to conclude and not intercede in the continuing detention. But since she was unaware of the arrest order and had no knowledge with respect to what transpired related to the shot, all of these facts down below were undisputed and in the record. Then she was reasonable, which would grant her qualified immunity, for believing there was a valid basis to continue the detention. Thank you. Thank you. We're running into time issues. My apologies. Thank you. Thank you. Next. Good morning. May it please the Court. My name is Michael Raines, and I represent Defendant and Appellant Johannes Meserle. I'm joined at council table by Laura Killeen Smith. By my account, I'm probably about one minute in the hole here. I'll try to be quick. Go ahead. Thank you, Your Honor. Your Honor, I realize the lower court had a daunting task of sorting out a lot of claims made by various plaintiffs against a number of defendant police officers. In trying to do that, I think the Court did an admirable job. The Court neglected to address plaintiff Antacetti's claims against Mr. Meserle for both unreasonable seizure and unlawful arrest. And let me just tell the Court about that very quickly. Mr. Meserle was on the platform for less than two and one-half minutes before the shot occurred, less than two and one-half minutes. And in the two and one-half minutes he was on the platform, his only contact with Mr. Antacetti occurred as he ran up to the scene where the officers had detained others. He turned around and he ordered Mr. Antacetti to step back. That is the entire contact with Mr. Antacetti. At the time the shot rang out at 2-1103, Mr. Antacetti was being tackled by Officer Knutson and was then taken away in handcuffs after he was arrested and seized by Officer Knutson. Mr. Meserle had no role in that, took no part in that, had no say in that, and was really unaware of that because of his involvement in the shooting. If we were to conclude that your client is not entitled to qualified immunity on any of the claims brought against him and the matter went back to trial and was fully tried to the jury, Judge Patel could still, based on the evidence actually presented at trial, grant him qualified immunity as to one or more of these events, correct? I believe that to be true, Your Honor, yes. If I may turn just very briefly to the plaintiffs, Nigel Bryce and Carlos Reyes, I make the same argument that Ms. Barry Wilkinson made there as to the qualified immunity of Marisol Domenici. Johannes Meserle literally had no communication, verbal or otherwise, with either Mr. Nigel Bryce and nor Mr. Reyes. He took no role whatsoever in their subsequent arrests and prolonged detentions. He had no fundamental involvement with them at all, and under the Blankenthorne case, fundamental involvement is required, and because that did not occur, I believe Mr. Meserle is entitled to qualified immunity as to their subsequent arrests and their prolonged detentions, as the Court indicated. I will turn briefly to the claim of Oscar or of Carlo, I'm sorry, of Mr. Bryson, and that's a false arrest claim, and there is no dispute about the fact that Mr. Meserle put handcuffs on Mr. Jack Bryson, Jr. He did. The question is, was the arrest of Mr. Bryson done with probable cause, or at the worst, did Mr. Meserle make a reasonable mistake in arresting Mr. Bryson? If he did, he would be entitled to qualified immunity under Anderson v. Creighton, and the evidence is very clear that at most, at most, it was a reasonable mistake, and let me say why. As Mr. Perrone came back from talking to the train operator, he literally walked by Mr. Michael Greer, who was handcuffed laying on the ground. Mr. Greer was already in handcuffs. He was already, from all appearances, under arrest. He walks by Mr. Greer. He looks in the direction of Jack Bryson, of Oscar Grant, of Johannes Meserle, and of Officer Guerra, and he says these words. He says, him and him are going for 148, pointing in the direction of Oscar Grant and Mr. Jack Bryson. Mind you, he's already passed over Mr. Greer. He's beyond him when he says that. And at that point in time, Johannes Meserle moves in to put handcuffs on Mr. Jack Bryson, who stands up along with Mr. Grant, both stand up. Mr. Meserle pushes Mr. Grant down by his shoulder. Then he pushes Mr. Bryson down by actually using what he called an armbar and puts him on the ground and tells him if he resists, he's going to tase him and begins handcuffing him immediately, without incident at that point. At no time does Tony Peroni, Officer Peroni, say, hey, wait a minute, what are you handcuffing him for? At no point does Officer Bryson say, what are you handcuffing me for? And, in fact, Officer Meserle is joined in the handcuffing procedure by Officer Guerra, who heard the order to arrest him and him. The evidence is clear that at worst, at worst, Officer Meserle made a mistake, a good faith, reasonable mistake. Well, isn't that a question of fact? No, Your Honor. I think if the evidence supports a claim, undisputed claim, that there was at worst a reasonable mistake of fact. Because the plaintiff's contention is it was pretty clear when he said him and him who Peroni was pointing to. I understand. So that's a difference on how both sides see the facts, right? I think the jury to decide that? Well, that's clearly what the district court said. I think the district court was obligated to make that ruling and had ample evidence before it to determine that there was simply a reasonable mistake made of fact and that qualified immunity was appropriate there. I will turn very briefly to the 14th Amendment claim of Oscar Grant, Jr., that is the loss of familial relations. And there it is our position that the lower court determined that qualified immunity was not appropriate based upon a Fourth Amendment analysis of Officer Meserle's use of force and not a 14th. And very clearly, the standard there is a purpose to harm unrelated to legitimate law enforcement objectives. Officer Meserle was in the process of handcuffing Mr. Grant. And he was granted qualified immunity as to the arrest of Mr. Grant. So he clearly had the right to place handcuffs on Mr. Grant. He was in the process of doing that. There was admittedly a struggle. He was carrying out legitimate law enforcement objectives. He was not attempting to punish. Isn't that what this is all about? I mean, it seems like that goes to the core issue of why we're here. So I don't know what authority, I mean, is there any cases that you cite that would support your view of that? Yes. Well, yes, Your Honor. I think the Porter v. Osborne case talks about the fact that if the actions of the officer, the force is used to punish or to injure as opposed to a legitimate law enforcement objective, then the officer is not entitled to qualified immunity. My belief is, and the evidence I think is very clear, that Officer Meserle was not attempting to punish. He was not attempting to do anything other than to place handcuffs on. He had, your client had earlier unholstered his taser, correct? That is correct, Your Honor. And my understanding is he kept the taser and his service revolver on different sides of his body, correct? That is correct. So in the, did he warn Grant that if he resisted, he was going to be tased? The evidence I think is undisputed that before he actually stood up, he yelled, Tony, Tony, I'm going to tase him, I'm going to tase him. And both Officer Peroni said that he heard that, and so did Mr. Jack Bryson, who was about a foot and a half away, make the statement that night when interviewed that he heard Officer Meserle say he was going to tase him, and then he stood up and shot him. So that evidence is in the record and is unrefuted that that warning was given. Your client's position is that he meant to reach for his taser and instead pulled out his service revolver? That is true, Your Honor. That mistake, that mistake by law enforcement officers. It's a familiar mistake with bar officers, isn't it? Pardon me? It's a familiar mistake that bar officers seem to make. It's a familiar mistake that a lot of officers made. It was the ninth such mistaken case where an officer in either the United States or Canada had intended to tase and announced their intention to tase somebody and had said and mistakenly shot them with their firearm. Only the second fatal incident, but the ninth such incident where there was a mistaken shooting by an officer who intended to tase. I don't think under the circumstances that amounted to an intent to harm, and it does not amount to behavior on the part of Officer Meserle that shocks the conscience, and therefore I believe Officer Meserle was entitled to qualified immunity based on the Fourteenth Amendment analysis and not the Fourth Amendment analysis. Thank you. Thank you. My name is John Burris, and I am opposing the motion request by the appellant Meserle as it relates to Oscar Grant, Jr. and the other plaintiffs who Mr. Siegel has made reference to. First off, Mr. Raines has certainly made this argument a number of times about an accidental shooting, but I will just say to the Court as a factual issue that is in the record that there is clear evidence that Mr. Meserle never told anyone that this was an accident and about the time this incident took place. It's very clear from Officer Perrone that shortly after the shooting he said, I thought he was going for a gun. On several other occasions within a very short period of time, within several days, he made the same statements to other police officers. Our argument on that is that's a factual question for the jury to decide whether or not that is consistent with his later statement that he made that it was an accident when point of fact is the statement he was going for a gun is clearly suggesting that he intended to do what he did to stop this particular person, Oscar Grant, at the time. And I will only say this from a factual point of view. There is no question that the videotape of this particular shooting, which has been seen worldwide by everyone, that at the time that Mr. Officer Perrone was on the knees of Mr. Grant, stepped up, pulled back, pulled out his service revolver, and shot Mr. Grant in the back. Mr. Grant's hands were behind his back in a helpless position at the time he was shot. That's a factual question, a material genuine issue. Now, it is clearly a purposeful act not designed for legitimate law enforcement purposes if you in fact shoot a person who is in a helpless position and you have the firearm and it was not justified to use that level of force. It may have been arguable that it wasn't even justified to use a taser. So even that level of force may not have been viable. So from my point of view, the Court made the legitimate and correct argument by saying that this is a genuine dispute. The defendant, Mr. Mesley, has a position. There's evidence that contradicts that. It seems to me that's a jury question to be decided. There are legitimate questions, from my point of view, on holding Officer Mesley, after the shot was fired, and he makes this statement to Mr. – to Officer Peroni, as to his continuing responsibility for the detention, ultimately, that all the other individuals were detained for an extended period of time and ultimately were handcuffed. The Court, the lower court, basically concluded that Officer Mesley was an integral participant in this process because, but for his conduct of having erroneously – having shot Mr. Grant, that the other actions never would have taken place. Now, the other action meaning that they would have been detained and ultimately arrested and handcuffed for a number of hours. It was his conduct that essentially did that. And unlike other arguments, he was not a mere bystander. It is true that he was removed shortly thereafter. But the conduct and the continued detainment and subsequent arrest of all the other young men happened as a consequence of his conduct. And I think the Court concluded that he was an integral participant in this process and, therefore, should be held responsible, or at least a jury should decide this question of his responsibility. Well, but the question is, under the case law, don't we have to look for something that indicates a purpose to harm or something, you know, other than a mistake? Well, it is a factual question to us from our point of view, and I think the Court concluded that it's a dispute about whether this is a mistake or not. Because he could have his own – he can have a subjective statement that it was a mistake. Any officer, most officers have a subjective statement. They always can have a view of that. But if you look at it from another point of view, and what is the other – is there other evidence that contradicts that, well, then that's a dispute that the jury has to decide. Now, a jury could conclude that if you shoot an unarmed person in the back who is flat out, that that is an illegitimate purpose and does not promote the legitimate law enforcement conduct. Now, that's a factual – a jury can make that decision. It is clear the defendant can always make his argument, and that argument will be made and there will be evidence that will – for a jury to decide. So we don't think that that is a – we think that that is an issue that is clearly in dispute. And I think the Court was clear whether you call it a – there's no question it's a shock to conscience issue if you, in fact, shoot someone in the back. I think your argument is just simply you can infer from the circumstances of the shooting, namely, you know, shooting an unarmed person in the back, you can infer from that.   The only way you can do that is to say, you know, there was a purpose to harm, right? Absolutely. I mean, that's all you have. That's all I need. Well, what case supports that? Well, I think the judge gave we had a purposeful harm in several cases here. I had Porter v. Osborne. This is a case that came out of Alaska where there was some factual dispute about it, and there was a lot of discussion in that court's argument, and this comes from the Ninth Circuit here about shock to conscience, but it really turned on the question that even if you overreach, if you will, overextend, use excessive force under circumstances that were clearly not merited, that that is not a legitimate purpose for law enforcement activity, and it's the purpose to harm. I mean, you shoot someone in the back, you know, you intend to harm them. Whether you have an argument that you want to make, that's a different question, but there are certainly evidence in the record in terms of just the video. If you just look at the video itself, you can see direct purposeful acts that took place. Mr. Grant was on the ground on his stomach. The officer's on top of him. He raises up, steps back, pulls out a revolver, and shoots him in the back. Now, a jury could look at that and say that that is, was a clear purpose to harm, and it served no legitimate law enforcement purpose by that kind of act. And so that, to me, I think is clearly a jury question to be decided. Thank you. Thank you. Mr. Raines, I assume that after this incident occurred in its immediate aftermath, the park authorities determined that there had been an officer-involved shooting. That is true. And your client was moved away from the scene. That is true. And questioned? Yes. And there were follow-up questions the next day and the day after? There were. At the time, he was represented by other counsel. There were attempts to question him. His counsel at the time advised him not to make a statement. When was the first time that your client said it was a mistake? The – well, publicly, if I may, Your Honor, without getting into the privilege. I'm not asking about anything privileged. Would have been at the preliminary hearing that was conducted in June of 2007. In the immediate aftermath of the shooting, he did not say, I made a mistake, I meant to tase him, and instead I shot him? No, he did not. He was advised by officers on the platform that he should not make a statement at all until he got counsel. And officers on the platform told him that before he was met by Lieutenant Franklin, who asked him only a series of three questions on the platform about the shooting, he answered those questions and said nothing more. Let me be very brief. Mr. Burris talked about the shooting itself. And let me indicate that there was associated with the shooting both the – what I'm going to say, the sounds of despair and the sights of despair. And, Your Honor, if I may, you had indicated that Mr. Meserly did not say it was a mistake. What he did say, as testified to by Carlos Reyes, who was within two feet of Mr. Meserly when the shot went off, is he said, oh, shit, oh, shit, I shot him. And he not only did that, but, of course, he fired only one round, not multiple rounds. He had the opportunity, if he intended to shoot Mr. Grant, to fire up to 13 rounds in rapid succession. He fired one round, and he did that because he thought he was firing a taser. Officers are taught to fire multiple rounds if they intend to shoot somebody. And Mr. Burris made an excellent point a minute ago. He said that Mr. Meserly stood up, and he did. As soon as the gun came out of the holster, he stood up. And he stood up erect, and he did that because officers are taught when they target to achieve neuromuscular incapacitation. And so Mr. Meserly stood up and actually moved back slightly when he fired the single round of what he thought was a taser by accident. And those are indeed the facts of the shooting and then his statement afterward. And numerous witnesses were in the record testifying that after the single shot was fired, his hands went to his head. Rather than the officer holding the gun on Mr. Grant, as an officer might if they intended to shoot him, he immediately holstered his firearm and his hands went to his head. And everybody saw that, and the videos all record his hands to his head, a man in shock and despair over an accidental shooting. So, no, he did not utter the exact words of mistake for those very reasons. But his actions spoke enormously louder than words ever could. There was a question about whether a shot in the back may in and of itself demonstrate a purpose to harm. I think if the shot in the back was an intentional shot, we would have an intent to harm. This was not such a case. The evidence is very clear. And let me indicate this to Mr. Burris's claim about Mr. Grant's hands at the moment the shot rang out being in his back. The shot occurred, to be precise, at 2-11-03 and three hundredths of a second. We know that because the cross video, when hooked up to a sound meter, shows that. And the precise position of Mr. Grant at the time the shot rang out was that his left shoulder was up off the ground because Mr. Perroni had gotten off him, having heard Meserly say, I'm going to tase him. Tony Perroni got up off Mr. Grant, put his left hand down toward Mr. Grant's head to hold it down. He got his body away and his left hand was holding his head down to keep him stationary, thinking that Mr. Meserly was going to shoot a taser into his back. So Mr. Perroni was not on Mr. Grant at all with anything other than a hand holding the head down when the shot went out because of the warning that had been issued. And Mr. Meserly stood up, moved slightly backward and fired the round. And that's recorded on the video. And Mr. Grant's left hand was up in the air, his left shoulder was up off the ground because he was starting to roll onto his right shoulder when the shot went off. And the best evidence of that, the best evidence of that was the forensic evidence that Mr. Burris didn't talk about. The fact that the bullet entered Mr. Grant's body at the left side of his spine and traveled left to right at a 30-degree angle in the body and lodged just on the right pectoralis area didn't exit because that part of the body was touching the ground. And therefore, there was no exit wound. We have a left-to-right trajectory. And yet the video shows without any question, the video shows Mr. Meserly's gun was directly over Mr. Grant's back when that shot was fired. There was only two possible scenarios from the forensic evidence of what occurred there. Either Mr. Meserly's barrel of his weapon had to be far to the left of Mr. Grant's body, firing left to right, or his barrel had to be pointed downward and Mr. Grant had to be in an angle where his left side of his body was up off the ground and the bullet traveling left to right. That was testimony that was clear in the criminal trial from the pathologist. And he said the second scenario was the scenario when looking at the video because the video showed the barrel of the weapon directly over Mr. Grant's back. Thank you. Thank you very much. Thank you all for your arguments today. The case is now submitted and we are now in recess. Thank you very much.
judges: Hawkins, Tashima, Murguia